UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:07cv222

| LINDA J. HORTON, | ) | |
|---|---|---|
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | **ORDER** |
| ALLTEL COMMUNICATIONS, INC., | ) | **AND** |
| WINDSTREAM COMMUNICATIONS, | ) | **MEMORANDUM** |
| INC., and LOCAL INSIGHT YELLOW | ) | |
| PAGES, INC., | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

**THIS MATTER** is before the Court on the Defendants' Motion for Summary Judgment and Memorandum in Support (Doc. Nos. 22 & 23), Plaintiff's Response and Memorandum in Opposition (Doc. Nos. 28 & 29), and the Defendants' Reply (Doc. No. 32). For the following reasons, the Court GRANTS Defendants' Motion.

**I. FACTS**

The Plaintiff, Linda Horton, began her employment with Alltel Publishing Company in September 2002. At the time, the company was known as Alltel Publishing, Inc. This company split off from Alltel Corporation and changed its name to Windstream Yellow Pages and then split again from Windstream Corporations and became Local Insight Yellow Pages, Inc. (collectively "Defendants" or "Alltel"). (Doc. No. 11 at n.1). Defendants fired Horton on April 14, 2006, alleging that Horton committed fraud against the company. (Doc. No. 30-2 at 19). Horton's then manager, Olga Gazapo, initiated the termination with the Human Resources Generalist Gail Bunce giving approval. (Id.).

1

During her time with Alltel, Horton received a promotion in October of 2003. (Doc. No. 30-2 at 2). Horton's job primarily consisted of finding businesses to place advertisements in telephone directories. Horton had different supervisors during her tenure at Alltel. Her last two supervisors were Michael Helms, who was her supervisor for over a year, and Gazapo, who was Horton's supervisor for three weeks before she was terminated. Helms and Gazapo reported to Area Vice President, Kurt Schubert, who oversaw the department and reported to Michael Weaver. Defendants assigned Keisha Bolin as the Human Resources Generalist for Horton's department until August 2005 when Gail Bunce replaced Bolin.

### A. Complaints by Horton Regarding her Treatment

On or about March 30, 2005, Horton sent a written complaint of racial discrimination to Keisha Bolin, complaining that her supervisor Helms treated her unfairly because of her race. (Doc. No. 31-2 at 2). Two days later, April 1, 2005, Horton supplemented this complaint with further allegations and examples of this disparate treatment. Horton believes nothing was ever done about either complaint. (Doc. No. 31-2 at 8-9). Bolin's affidavit states that she investigated the allegation and found it to lack merit. (Doc. No. 26 at 2). Believing that her complaint had never been addressed, eight months later in December 2005, Horton again appealed for help to the new Human Resource Generalist, Bunce. (Doc. No. 31-2 at 11-12). Horton's complaint did not specifically mention race discrimination but referenced her earlier written complaints to Bolin and asked that Bunce look into the discrimination. (Id.). Bunce forwarded these complaints on to Schubert and Helms. (Doc. No. 30-2 at 4). Again, on December 27, 2005, Horton relayed a situation to Bunce and two other employees in which she thought she was being treated unfairly by her supervisor Helms. (Doc. 31-2 at 17-18). Then on April 28, 2006, Horton made two complaints to the Defendants'

Ethics and Compliance Employee Hotline, first reporting behavior of Helms and Schubert and second reporting behavior of Gazapo. (Doc. No. 32-3 at 35-38). Neither of these complaints mentioned race. Defendants provided evidence that the two ethics complaints were investigated by asking questions of Helms, Schubert, and Gazapo. (Doc. No. 32-3 at 39-40). Alltel fired Horton about two weeks later.

### B.     Source of Horton's Complaints

Horton's written complaints in March and April of 2005 to Bolin focused primarily on how Helms treated her. Horton complained that Helms took one of her commission-based customers away and gave the customer to another co-worker. She also alleged that Helms gave select accounts to certain white employees and would not give her assistance after she requested help. (Doc. No. 31-2 at 2). In her second written complaint to Bolin, Horton addressed many of the same circumstances adding that Helms spoke to her in a condescending and abrasive manner which he did not do to other employees. (Id. at 8-9). In this complaint Horton noted that Helms gave some of the better accounts to an employee named Dora who is also a black female. (Id. at 8).

Horton's written complaint in December 2005 to Bunce was largely based on an incident from that fall. Horton alleged that a commission-based customer placed an advertisement with her. This customer then wanted a change to the advertisement, but since Horton was out of the office on bereavement leave, Helms handled the call. (Doc. No. 31 at 6). The changes were not made to the advertisement, causing the customer to complain. After the customer's complaint, the company removed Horton's commission for the sale. The Customer Relations Representative looking into the matter found that the customer said he spoke with Helms directly about the changes, and Helms assured him that the changes would be made in the new edition, but that the changes were not in the

3

new edition. (Doc. No. 31-3). Although the customer stated that Helms was the employee who said he would make the changes, the revenue was still removed from Horton's account. (Doc. No. 31-3 at 2-5). Horton's complaint again alleged that this occurred because of discrimination; further, she stated that she was not invited to a team lunch outing, she alleged that Helms monitored her lunch breaks more closely than others, and she again alleged that Helms was disrespectful and abrasive to her. (Doc. No. 31-2 at 11-12). At the end of December 2005, Horton again filed a complaint with Bunce. This time Horton alleged that Helms may have manipulated her computer connection. The computer connection allowed Horton's phone calls with customers to be recorded. In this complaint Horton explained that an IT help desk employee came to help her only to have Helms step in and take over trying to fix her computer problem. She stated that after he said the problem was fixed and that the computer system would now properly record her calls with customers, she then noticed that one of the cords was not plugged in and it previously had been. (Doc. No. 31-2 at 17). Although she did not say it was purposeful, she felt that Helms was not providing adequate assistance.

Then on April 28, 2006, Horton made two ethics complaints. The first was about the same situation involving the customer who requested a correction to his advertisement which Alltel printed without the change. This complaint alleged that Vice President Schubert ignored Horton's allegations and that Helms acted unfairly by removing the commission from Horton when it was his carelessness that caused the problem. (Doc. No. 31-2 at 14). The second complaint that day was about the same account, but this complaint alleged that Horton's new manager, Gazapo completely removed the customer's account from Horton. (Id. at 15). The complaint alleged that Gazapo said that the customer never wanted to work with Horton again, and Horton complained that the customer never said any such thing. (Id.). Neither report mentioned any racial motive. Alltel provided copies

4

of the investigation report for both of these ethics complaints. (Doc. No. 32-3 at 39-40). After interviewing Helms and Schubert, the first investigation concluded that although Helms took the correction information from the customer and gave the paper work to Horton, she never processed the corrected paperwork. Helms therefore charged this mistake against Horton. (Id.). As for Horton losing this account, the second investigation conducted an interview of Gazapo and found that this account was no longer in Horton's assigned canvass area for 2006, but was in the area of another sales representative. (Id.). Alltel never told Horton about its investigation findings. In Horton's deposition she states that she was out on leave at the time the customer asked for the changes to his account and never knew about the requests. She stated that since she was out on leave, the paperwork could not have been given to her to process as Helms alleges. (Doc. No. 31 at 6).

    **C.**    **Events Leading up to Horton's Termination**

In the end of March 2006, a fellow employee, Brian Coggins, approached Horton regarding a lead he had on a possible account. He said that he had been assigned a customer who called in to place an advertisement. (Doc. No. 31 at 7). After speaking to the customer he found out that the customer had two telephone numbers. He checked on the second number, 912-674-1578, ("1578"), and found that this phone number had already been assigned to Horton as a possible client. He approached Horton to request that they split the commission since he had begun the relationship even though the phone number was assigned to Horton. (Id.). According to Horton, Coggins told her that he spoke with a Mrs. Johnson who wanted to advertise a company named Imaginations. Horton agreed to split the commission on this sale. There is no company policy regarding commission splitting.

5

Horton says when she called Mrs. Johnson she discovered she had previously spoken to her, but under a different phone number, 912-673-0045 ("0045"). (Id.). Horton states that she went to Gazapo and told her that this customer was originally hers and that she had already called her before Coggins made contact. Horton also states that she checked with the directory clerk at Alltel about the discrepancy, and this clerk said that there were two "log-ins" for the customer which might show that two employees had contacted the customer. Horton said the log showing she called should have been on her desk, but it was no longer there when she returned from surgery-leave.

Horton says she spoke with Mrs. Johnson and set up an advertisement for her business, Imaginations. This account was a $22.00 account and Horton split this commission with Coggins. (Id. at 8). Horton states that she completed the sale on March 30, 2006, but was waiting on some documents from Mrs. Johnson, so she reported the sale on April 3, 2006 when she got that information. In Horton's affidavit she states that Mrs. Johnson then referred her to her husband, Mr. Johnson for some other possible advertising. (Id.). Horton spoke with Mr. Johnson on April 3 and 4, 2006, and discussed a possible advertisement for his business. Horton recorded the possible transaction under the same phone number as Mrs. Johnson's business number. Later on April 4, Horton spoke with Mr. Johnson again, and he said that he wanted his own business number. Horton says she then "superseded" the earlier paperwork and set up his advertisement as separate from his wife's advertisement. (Id. at 9). Horton states that neither she nor Coggins knew about the possible sale to Mr. Johnson, and since she did the sale completely herself, she did not feel she should split that sale with him. (Id.). The advertisements ran with Imaginations listed under the 0045 number and Mr. Johnson's business listed under two numbers, primarily the new business number 912-882-

8998 ("8998") and a cell phone, the 1578 number, Coggins' original number of contact. (Doc. No. 31-4 at 2-4).

Alltel's perception of these events is much different. Alltel's records indicate that a customer at the 1578 number called twice to request information about placing advertisements in the telephone directory. Both calls were forwarded to a team other than Horton's, and at least one of these leads was given to Coggins. (Doc. No. 23 at 5). Alltel further states that this explains the two "log-ins" and that Horton was not at work on either day that these calls came in. (Id.). When Coggins called the 1578 number he discovered that the customer also had a cell phone with the 0045 number. In keeping with company policy, Coggins checked this number and discovered it was assigned to Horton. (Id.). This is when he spoke with Horton and requested the commission split. (Id.). In an email on April 7, 2006, after the whole situation transpired, Coggins states that he and Horton had agreed to split "this and whatever the husband ended up doing." (Id.).

Alltel then presents evidence to show that Horton submitted paperwork on different days with conflicting information. (Id.). Horton's supervisor Gazapo states that Horton concocted the paperwork in such a manner as to hide the two related accounts to keep the second commission completely to herself. (Doc. No. 24 at 3). Originally, Horton completed two separate contracts for the Johnson companies, and since originally the companies were anchored on the same phone number, only one contract should have been completed. (Doc. No. 23 at 10). Yet, Horton later canceled Mr. Johnson's contract and set up a different contract with him under a new telephone number.

As is company policy, phone calls with customers are recorded, but as highlighted above with Horton's earlier computer issues, computer problems can cause those recordings to be inaudible or

to not record at all. On the date that Horton allegedly received authorization for the Imaginations advertisement, April 3, 2006, the only phone call saved to the company system was a call with Mr. Johnson. During this call, Mr. Johnson stated that Horton would have to speak with his wife about the details of her advertisement. (Doc. No. 24-7 at 4). There is no record of a call between Mrs. Johnson and Horton for that date. Horton acknowledges that the recorded authorization is missing, but states that she spoke both to Mr. Johnson and Mrs. Johnson that day, and she is unsure why the second recording is missing, but cites that everyone has access to the public drive on the computer and anyone could have erased it. (Doc. No. 31 at 9). It is a terminable offense at Alltel to submit an authorization for an advertisement without a recorded authorization. (Doc. No. 24 at 7). The paperwork submitted by Horton shows Mr. Johnson as providing authorization and does not provide a date. (Doc. No. 24-6 at 2). The authorization number in this paperwork actually references a phone call with Mr. Johnson on April 4, 2006, where he said he could not confirm information about his wife's advertisement. Horton received an email from Mrs. Johnson on the previous evening, April 3, which references both advertisements, "[h]ere is the information for our ads," and says to call her with questions. (Doc. No. 30-2 at 27). From this email it is unclear if she gave authorization earlier that day for her advertisement or if the process was still on going.

On or about September 2006, another situation arose in the Charlotte area Alltel phone book advertising department. This time, an employee by the name of Amy Lamb needed a "premise" representative to go meet a client about possible advertising. (Doc. No. 31-4 at 13). Lamb contacted David Mason to conduct the visit for her. (Id.). Mason informed Lamb that he had difficulty making the visit as the customer did not keep scheduled appointments, so Lamb agreed to split the commission on the account. (Id.). Later Mason concealed that he completed the sale and kept the

8

commission for himself. (Id. at 14). Lamb pushed the issue with Mason's supervisor, Mark Bradley, and Schubert but never heard anything from either of them. (Id.). Lamb then used the company ethics line to file a report; again she heard nothing. (Id.). Finally after continuing to push the issue, Lamb got an email from Mason on October 1, 2006, where he stated that he worked harder on the account and did not feel he should have to split the commission with her, and he admitted that he purposefully "mis-led Amy." He sent this email to his supervisor as well. (Id. at 14-15). No adverse employment action was taken against Mason. (Id. at 14).

## II. SUMMARY JUDGMENT STANDARD

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).

Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Id. at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. Id. at 324. The nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." Anderson

9

v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also Sylvia Dev. Corp. v. Calvert County, Md., 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 255. This is especially true in employment discrimination cases where determinations of motive and causation are critical. Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 958-59 (4th Cir. 1996). However, this is true only if there is a "genuine" dispute as to those facts. Scott v. Harris, 550 U.S. 372, 380 (2007). "'Where the Record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" Ricci v. DeStefano, No. 07-1428, slip op. at 26, 557 U.S. ___ (2009) (quoting Matsushita v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

## III. DISCUSSION

Horton alleges that Alltel violated Title VII and § 1981 by firing her in April of 2006.[1] Further she alleges defamation and intentional infliction of emotional distress. Alltel seeks summary judgment as to all of Horton's claims.

### A. Standard for a Title VII Claim - Discriminatory Discharge

Horton seeks to establish a Title VII claim for discriminatory termination under the three-step McDonnell Douglas burden-shifting framework. McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Under the three-step McDonnell Douglas standard, the plaintiff must first establish a prima

---

[1] Alltel requests that the Court not consider the § 1981 claims because Horton failed to specifically mention these claims until her third amended complaint and she was not given leave by the Court to add claims. Recognizing that the events, allegations, and standard for review are the same for Title VII and § 1981, the Court will consider both claims.

facie case of employment discrimination by producing evidence to fulfill four criteria related to the employment. Id. at 802. If the plaintiff provides credible evidence of all four criteria, there is a presumption of discrimination. At the second step, the burden shifts to the defendant to provide some legitimate nondiscriminatory reason for its employment decision. Id. If the employer provides a nondiscriminatory reason for its decision, the court then looks to the third step of the standard, and shifts the burden back to the plaintiff to show by a preponderance of the evidence that the defendant's proffered reason is pretextual. Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-53 (1981). If a plaintiff fails to establish a prima facie case of discrimination or later fails to raise a material factual dispute concerning the employer's non-discriminatory reason for the alleged discriminatory act, the defendant is entitled to summary judgment. Henson v. Liggett Group, Inc., 61 F.3d 270, 274 (4th Cir. 1995).

### 1. Step One: Four-Prong Prima Facie Case Requirements

To create a prima facie case of discriminatory discharge under McDonnell Douglas, the plaintiff must show "(1) she is a member of a protected class; (2) she suffered adverse employment action; (3) she was performing her job duties at a level that met her employer's legitimate expectations at the time of the adverse employment action; and (4) the position remained open or was filled by similarly qualified applicants outside the protected class." Miles v. Dell, Inc., 429 F.3d 480, 485 (4th Cir. 2005).

#### a. The Third Prong of the Prima Facie Case Standard

Horton is an African-American woman, who Alltel fired. Horton fulfills the first two prongs of the prima facie requirements.

11

It is Horton's burden to prove that she was performing her job duties at a level that met her employer's legitimate expectations at the time of the discharge. Alltel provided the Court with substantial evidence that it is a terminable offense to submit an advertisement sale without a recorded authorization from the customer. Further, Alltel contends that Horton committed fraud in her handling of the paperwork for Johnson's advertisements. In both Horton's deposition testimony and her sworn affidavit, she states that she received authorization from the client and is unsure why this recording is not in the company records. Horton's evidence does not show that the recording was in fact in the company records nor that any illicit removal occurred. Alltel's objective requirements were not met and Horton simply has not met this third prong.

### b. Horton Fails to Fulfill the Fourth Prong of the Prima Facie Case Standard

Even assuming Horton did meet the employer's reasonable expectations, she cannot provide evidence to create a question of material fact as to the last prong of the McDonnell Douglas prima facie standard, which requires that after her discharge, the position remained open or was filled by applicants outside her protected class. Alltel filled Horton's position with an African-American over the age of forty. (Doc. Nos. 24 at 10 & 25 at 10).

### c. Exceptions to the Fourth Prong of the Prima Facie Case

The Supreme Court noted in McDonnell Douglas that factual situations may call for different applications of the fourth prong of the prima facie case. Id. at 802 n.13. The fourth prong should not be rigidly applied; instead the court should consider if the plaintiff "was rejected under circumstances which give rise to an inference of unlawful reasons for the plaintiff's rejection." Burdine, 450 U.S. at 253.

The Fourth Circuit outlined a few exceptions to the fourth prong of the McDonnell Douglas prima facie framework in Miles v. Dell, 429 F.3d 480, 487-89 (4th Cir. 2005), and Brown v. McLean, 159 F. 3d 898, 904-06 (4th Cir. 1998). In Miles, the court held that if the hiring process involved two decision makers, and one decided to fire the plaintiff for discriminatory reasons, and the other hired someone within the same protected class, the actions of the second decision maker would not absolve the first decision maker's discrimination. Miles, 429 F.3d at 483. Another exception to the fourth prong of the test occurs when a defendant hires a person within the protected class to disguise the discriminatory behavior in relation to the plaintiff. Brown, 159 F.3d 904-06.

There exists no evidence that there were two decision-makers or that the hiring of an African American replacement was an attempt to disguise a discriminatory act. Thus, neither of the exceptions apply, and Horton has failed to meet this fourth prong. Considering the facts in a light most favorable to the non-moving party, there is nothing in the record to show that race or age played any part of the employment decision.[2] Even more so, Horton failed to establish any genuine issue as to a material fact related to her Title VII claim for discriminatory discharge, and summary judgment is appropriate.

**B. Standard for a 42 U.S.C. § 1981 Claim of Discriminatory Termination**

Section 1981 confers upon all people within the jurisdiction of the United States the full and equal benefit of all laws. The standard for establishing a claim under § 1981 is the same as under

---

[2] Under Title VII, a plaintiff can either proceed under the mixed-motive theory, the McDonnell Douglas pretext theory, or both. The Court need not address the mixed-motive theory in this case. See Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 286 (4th Cir. 2004) (citing, Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 153 (2000) ("[r]egardless of . . . whether [plaintiff] proceeds under a mixed-motive or a single-motive theory, 'the ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination.'")).

§ 2000e. Bryant v. Bell Atl. Md., Inc., 288 F.3d 124, 133 n.7 (4th Cir. 2002) (citing Gairola v. Commonwealth of Va. Dep't. of Gen. Servs., 753 F.2d 1281, 1285 (4th Cir. 1985)). Therefore, the Court applies the McDonnell Douglas test and for the reasons stated above, Horton failed to make sufficient showing to defeat Alltel's motion for summary judgment on her § 1981 claim for discriminatory termination. Thus, the Court grants summary judgment to Alltel as to Horton's § 1981 claim.

**C. Standard for Title VII or § 1981 Claim - Retaliation**

1. Horton Fails to Establish a Prima Facie Case of Retaliatory Discharge

Horton claims that she was fired in retaliation for lawful complaints against her employer. This claim is evaluated under a similar prima facie showing. A plaintiff must prove (1) that she engaged in a protected activity; (2) that the employer took an adverse employment action against her; and (3) that there is causal connection between the protected action and the adverse action. Carter v. Ball, 33 F.3d 450, 460 (4th Cir. 1994). The casual connection may be inferred from the temporal proximity of the protected activity and the adverse employment action. McNairn v. Sullivan, 929 F.2d 974, 980 (4th Cir. 1991)

For over a year, Horton made repeated complaints of discrimination to several people at Alltel. Notwithstanding these complaints she continued in her employment. Then in April, 2006 she made additional complaints not based upon race. Within two weeks of the non-race related complaints, she was fired.

Alltel argues that the decision makers, Bunce, Gazapo, and Weaver were unaware of Horton's discrimination complaints, so there could be no causal connection. The Court finds this argument unavailing. First, Bunce received several complaints directly from Horton, one of which

14

mentioned the letters to the previous HR Generalist, Bolin, which cited race discrimination. (Doc. No. 31-2 at 11-12). Bunce forwarded this complaint of discrimination to Schubert, who wrote an email response to the allegations, on which Schubert carbon-copied Weaver and Helms. (Doc. No. 30-2). Finally, the investigation reports of the two complaints at the end of March 2006 state that Helms, Schubert, and Gazapo were all interviewed. (Doc. No. 32-3 at 39-40). Clearly these parties were aware of Horton's complaints. Establishing that Horton meets the requirements for a prima facie showing of retaliatory discharge, the Court now considers if Alltel had a legitimate non-discriminatory reason for Horton's termination.

### 2. Alltel Establishes a Legitimate Non-Retaliatory Reason for Termination

Alltel's reasons for believing that Horton committed fraud or at least violated company policy were legitimate, non-retaliatory reasons for Horton's termination. The burden again shifts back to Horton to show that this reasoning is pretext for retaliatory discharge.

### 3. Horton Fails to Establish that there is a Material Question of Fact as to Possible Pretext in the Discharge Decision in Relation to Retaliatory Discharge

A plaintiff bears the burden to show pretext in a claim for retaliatory discharge. The evidence Horton provided the Court did not show any sort of racial animus from the decision-making parties, but it did show a frustration with Horton's complaints. (Doc. No. 30-2 at 4). This alone is not enough to create a question of fact regarding possible retaliatory discharge, as any employer might become frustrated when an employee continually complains.

Horton also provided evidence that another employee in Charlotte, Mason, committed a similar act as the one Alltel alleges against Horton, but Alltel took no disciplinary action against this employee. Horton asserts that the court should infer pretext from Alltel's differential treatment of

Horton, an African American female, and Mason, a Caucasian male. For Horton to prevail, she would have to show that she and Mason were similarly situated in all relevant aspects. Even taking the facts more favorably to Horton, Horton cannot show that she and Mason were similarly situated. First, Horton and Mason had different supervisors and worked for different groups. See Radue v. Kimberly-Clark Corp., 219 F.3d 612, 617-18 (7th Cir. 2000) ("In determining whether two employees are similarly situated a court must look at all relevant factors, the number of which depends on the context of the case. For example, in disciplinary cases – in which a plaintiff claims that he was disciplined by his employer more harshly than a similarly situated employee based on some prohibited reason – a plaintiff must show that he is similarly situated with respect to performance, qualifications, and conduct. This normally entails a showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." (internal citations omitted)); Mitchell v. Toledo Hosp., 964 F.2d 577, 583 (6th Cir. 1992) ("It is fundamental that to make a comparison of a discrimination plaintiff's treatment to that of non-minority employees, the plaintiff must show that the 'comparables' are similarly-situated in all respects. Thus, to be deemed 'similarly-situated', the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." (internal citation omitted)). Second, the decision makers who terminated Horton's employment were not the same individuals who had knowledge of Mason's situation. See Heyward v. Monroe, No. 97-2430, 1998 WL 841494, at *2 (4th Cir. Dec. 7, 1998)

16

("If different decision makers are involved, employees are generally not similarly situated."); Harvey v. Anheuser-Busch, Inc., 38 F.3d 968, 972 (8th Cir. 1994) ("When different decision-makers are involved, two decisions are rarely 'similarly situated in all relevant respects.'"). Third, there is no evidence that Mason manipulated paperwork, failed to obtain a valid recorded authorization from the customer, or had falsely identified that he had obtained the requisite recorded authorization when he had not. The Court therefore concludes that Horton and Mason are not similarly situated and Horton's attempt to use Mason to show pretext fails.

Additionally, there are other compelling uncontested facts that support a finding of lack of racial animus including the fact that at the time of plaintiff's firing, she was replaced by an older member of her gender and race; that Alltel filled another vacancy at the time with an African American female; and that plaintiff complained of her supervisor treating another black female better than her. Further, Alltel credibly explained Horton's firing as being based on not only her committing fraud in her paperwork, but also that she failed to submit an authorization for advertisement with a recorded authorization which is a terminable offense. Thus, the Court grants summary judgment to Alltel on Horton's retaliation claim.

**D. Standard for Defamation Claim**

Horton alleges that Alltel or employees at Alltel defamed her by stating to others that Horton committed fraud. Alltel seeks summary judgment on Horton's claim of defamation.

In general, a statement is defamatory if it is likely "to prejudice another in his reputation, office, trade, business, or means of livelihood." Morrow v. Kings Department Store, 290 S.E.2d 732, 736 (N.C. Ct. App. 1982). To establish a prima facie defamation claim, a "plaintiff must allege and prove that the defendant made false, defamatory statements of or concerning the plaintiff, which

17

were published to a third person, causing injury to the plaintiff's reputation." Smith-Price v. Charter Behavioral Health Sys., 595 S.E.2d 778, 783 (N.C. Ct. App. 2004) (quoting Tyson v. L'Eggs Prods., Inc., 351 S.E.2d 834, 840 (N.C. Ct. App. 1987)). However in some circumstances a party may have an absolute or qualified privilege to make certain statements. Defamatory statements made during judicial proceedings fall under the absolute privilege. Harris v. NCNB Nat'l Bank of N.C., 355 S.E.2d 838, 842 (N.C. Ct. App. 1987). Further, a qualified privilege exists when a communication is made "(1) in good faith, (2) on a subject matter (a) in which the declarant has an interest or (b) in reference to which the declarant has a right or duty, (3) to a person having a corresponding interest, right, or duty, (4) on a privileged occasion, and (5) in a manner and under circumstances fairly warranted by the occasion and duty, right, or interest." Showell v. U.S. Airways, Inc., No. 3:06cv384, 2007 WL 3275131, at *8 (W.D.N.C. Nov. 2, 2007) (citing Shillington v. K-Mart Corp., 402 S.E.2d 155, 159 (N.C. Ct. App. 1991)). North Carolina courts found that this privilege extends to administrators providing the reason for an employee's termination or providing information about an employee in day-to-day business activities. Troxler v. Charter Mandala, 362 S.E.2d 665, 668 (N.C. Ct. App. 1988); Long v. Vertical Techs. Inc., 439 S.E.2d 797, 800-01 (N.C. Ct. App. 1994).

Horton alleges that Alltel committed defamation at least twice, first in emails to another Alltel employee during the investigation into Horton's alleged fraud and then a second time in the hearing before the Unemployment Commission. The first instance falls within the recognized qualified immunity for employers investigating a situation and providing appropriate parties with necessary information. The second situation falls within the absolute privilege as judicial testimony. The Court grants Alltel's motion for summary judgment as to Horton's claim for defamation.

### E. Standard for Intentional Infliction of Emotional Distress

Horton brings an action for intentional infliction of emotional distress ("IIED") against Alltel for the actions taken right before and including her termination. To prevail on a claim for IIED under North Carolina law, the plaintiff must allege that the defendant engaged in extreme and outrageous conduct and that this conduct was intended to cause, and did in fact cause, severe emotional distress. Waddle v. Sparks, 414 S.E.2d 22, 27 (N.C. 1992). The determination of whether conduct is extreme and outrageous is a question of law for the Court. Id. "The term 'severe emotional distress' means any emotional or mental disorder, such as, for example, neurosis, psychosis, chronic depression, phobia, or any other type of severe and disabling emotional or mental condition which may be generally recognized and diagnosed by professionals trained to do so." Johnson v. Ruark Obstetrics, 395 S.E.2d 85, 97 (N.C. 1990). Extreme or outrageous conduct is conduct "so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Smith-Price v. Charter Behavioral Health Sys., 595 S.E.2d 778, 782 (N.C. Ct. App. 2004).

Here Horton alleges that the race discrimination she suffered and the allegation of fraud amount to IIED. First, the allegations Horton asserts do not rise to the level of atrocious, therefore, the conduct is not outrageous. Further, in Horton's affidavit, she states that the situation has caused her to be "overcome by emotions," put her in an "unacceptable predicament," and it is eating her up. (Doc. No. 31 at 12). None of these show any sort of mental condition. Horton provides no evidence of outrageous conduct or severe emotional distress and as such the Court grants Alltel's request for summary judgment as to this claim.

## IV. CONCLUSION

Horton produced insufficient evidence to withstand Alltel's motion for summary judgment as to the Title VII and § 1981 claims for discriminatory termination and retaliation. Not every contested termination of employment case results in a triable discrimination lawsuit. The parties apparently do not like or respect each other. But there has been no showing of racial animus, express or implied. After assessing genuinely disputed evidence in a light most favorable to Horton, the Court finds she failed to establish a prima facie case of discrimination; and to the extent she has, she has failed to show pretext related to race or age discrimination as to Alltel's decision to terminate her. No reasonable juror could conclude that Alltel's proffered non-discriminatory reasons for the employment decision were pretext for racial bias.

Finally, Horton failed to provide any evidence of defamation or intentional infliction of emotional distress.

**IT IS, THEREFORE, ORDERED** that Alltel's motion for summary judgment (Doc. No. 22) is **GRANTED**.

Signed: July 1, 2009

Robert J. Conrad, Jr.
Chief United States District Judge